```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK

In re:                               :
                                          Docket #17cv2858
 DEVPAT AB,                           :

                    Plaintiff,        :

   - against -                        :

 USANA HEALTH SCIENCES INC.,          : New York, New York
                                        October 30, 2018
                    Defendants.        :

------------------------------------ :

                      PROCEEDINGS BEFORE
               THE HONORABLE KATHARINE H. PARKER,
           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:           GREENBERG TRAURIG, LLP
                         BY:  RICHARD PETTUS, ESQ.
                         200 Park Avenue
                         New York, New York 10166

For Defendant and        KIRTON MCCONKIE
and Non-Parties:         BY:  JAMES BURTON, ESQ.
                              JEFFREY LINDENBAUM, ESQ.
                         1800 World Trade Center
                         60 East South Temple
                         Salt Lake City, Utah 84145-0120




Transcription Service:   Carole Ludwig, Transcription Services
                         141 East Third Street #3E
                         New York, New York 10009
                         Phone:  (212) 420-0771
                         Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

<u>INDEX</u>

**E X A M I N A T I O N S**

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | <u>Re-<br>Direct</u> | <u>Re-<br>Cross</u> |
|---|---|---|---|---|
| None | | | | |

**E X H I B I T S**

| <u>Exhibit<br>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | <u>Voir<br>Dire</u> |
|---|---|---|---|---|
| None | | | | |

```
 1                          PROCEEDINGS              3

 2          THE CLERK:  Calling case 17cv2858, Devpat v.

 3  USANA Health Services.  Counsel, please make your

 4  appearance on the record.

 5          MR. RICHARD PETTUS:   On behalf of the plaintiff

 6  Devpat, Richard Pettus.  Good afternoon, Your Honor.

 7          MR. JAMES BURTON:   Good afternoon, Your Honor,

 8  James Burton and Jeffrey Lindenbaum on behalf of the

 9  defendant USANA Health Sciences, also on behalf of the

10  non-parties, Dr. Mehmet Oz and ZoCo Productions LLC.  Good

11  afternoon.

12          THE COURT:  Good afternoon.  Okay, so this –

13  the issue before the Court are the subpoenas that have

14  been served on ZoCo Productions and Dr. Oz.  And the

15  purpose of this conference is to talk about the proposed

16  motions and set a briefing schedule, to the extent that's

17  necessary.

18          I'd like to hear I guess first with respect to

19  plaintiff why do you, do you think that any of these

20  topics can be narrowed to the extent the third parties

21  have complained about them.

22          MR. PETTUS:  Your Honor, we've obviously looked

23  at that and we even had to reissue subpoenas from, at

24  first we had served Harpo and talked to their counsel.

25  They were all over the website.  They told us they didn't
```

```
 1                          PROCEEDINGS                    4
 2   own the rights to the marks.  And so we reissued – and we
 3   did look at these issues.  We took it seriously.  But it's
 4   all in relevant discovery that we feel that we need.  That
 5   goes to not only infringement and the scope of the
 6   infringement but, more importantly, to willfulness and
 7   damages.
 8            THE COURT:  Well, it seems to me that some of
 9   the items maybe could be obtained first from USA NA Health
10   Sciences, no?  So, for example, communications between USA
11   NA and ZoCo and/or Dr. Oz, wouldn't defendant be able to
12   provide you with that?
13            MR. PETTUS:  So they have provided us with
14   some, and, again, when I say some, I think I don't want to
15   overstate or understate, but there's probably about 50
16   emails that we've gotten.  And some do relate directly to
17   the SmartShake product, and I'm sorry that we missed that
18   the way we did with Your Honor's rules on the
19   confidentiality, but we thankfully straightened that out
20   appropriately with counsel.
21            THE COURT:  That's okay.
22            MR. PETTUS:  But, you know, the communications
23   with USANA, again, maybe they've given us everything.  We
24   have our doubts --
25            THE COURT:  So it's pronounced USANA not USA
```

```
 1                        PROCEEDINGS                    5
 2   NA? Okay, got it.  Thank you.
 3            MR. PETTUS:   We have our doubts, and if that's
 4   the scope of it, obviously it's not an incredible burden
 5   to them 50 emails.  What we're really after though are,
 6   you know, the internal communications, and even - you
 7   know, there's something, I know you're jumping into this
 8   as you are and it's definitely appreciated, but obviously
 9   there's a whole background to it, and we did our best in
10   the short amount of space we had to describe what we're
11   really after and why it's relevant.
12            But one thing if I could just two seconds, this
13   case started with Dr. Oz who is, when you talk about a big
14   company, a billion dollar company like USANA, you know,
15   they have advertising firms, he's their main advertiser.
16   And that's not simply why we're going and feel we need
17   this deposition.  What happened was, and the way our
18   client became aware of the infringement is Dr. Oz did his
19   show, and we got a call from a consumer saying I saw your
20   product on Dr. Oz's show and I'd like to get it.  Can you
21   send it to me?  And that's what's called actual confusion
22   under the trademark law, and that's very relevant, and
23   it's relevant not only to generally infringement but also
24   to willfulness.
25            And we do feel there's a very strong willfulness
```

```
 1                          PROCEEDINGS                    6
 2   claim here because as of today, we printed out the website
 3   pages, they're still using the trademark to sell the
 4   product.  Dr. Oz still has it.  And --
 5              THE COURT:  Well, so I'm sorry to interrupt
 6   you, but I just want to get clarification on the internal
 7   communications.  You're talking about internal
 8   communications within ZoCo, between and among Dr. Oz and
 9   others within ZoCo about this product or about potential
10   confusion of consumers.  For example, there maybe is some
11   customer line within ZoCo where somebody might've sent an
12   inquiry that would reflect confusion that might not have
13   been shared with defendant.  Is that the type of thing
14   that you're looking for?
15              MR. PETTUS:  So you got to my point which I was
16   intending to get to but you got to it much quicker than I
17   did, and I apologize for the sideshow.  Yes, that's the
18   additional instances of actual confusion where Dr. Oz, and
19   some of those 50 emails, USANA writes to Dr. Oz and said
20   we showed this coconut oil product and there's some issues
21   that we're hearing about from the public.  Are you getting
22   inquiries from the public and can you talk about it?  So
23   he's aware of it and it happens and it happened with us,
24   and that's highly relevant factual information.
25              But then, yes, the other information,
```

PROCEEDINGS                              7

(indiscernible) downplay it, but their internal

communications about it wasn't just this one episode, and

we keep hearing that and I understand why that's the

argument that's being presented.  But there was the one

show, then there was a sweepstakes that took place over

the course of weeks, and they're still promoting it today

on the website.

So the other information that is relevant to

willfulness, and, again, willfulness, are you doing the

infringe – are you infringing intentionally, and that's a

factual question, and part of it is based on, okay, when

did you become aware that there was this issue, did USANA

tell you, did you learn of it otherwise, have you not

heard of it until you saw subpoenas, and even if that's

the case, what have you done since then.  That's relevant

because if USANA told them, their reaction, those internal

communications are relevant, but also USANA didn't tell

them, and you say to yourself there's no burden in

producing documents that don't exist, but that's where the

deposition's going to come in.

And obviously if USANA didn't tell them while

all of this was going on, and when I say all of this,

there was a prior Utah suit that they jumped the gun and

filed --

```
 1                         PROCEEDINGS                    8

 2             THE COURT:   Right, I saw that.

 3             MR. PETTUS:   And, again, if you're acting in

 4   good faith, you take steps to correct or, you know, again,

 5   if you're in good faith don't want to infringe a

 6   trademark, you do something, and nothing's happened.

 7             And so, again, on some of these issues I'm sure

 8   there's internal communications, they would have taken

 9   place potentially after the filing of this lawsuit.  And

10   when you ask can we get it from USANA, one objection is

11   that, objection that they have imposed across their entire

12   production is we're not going to give you documents that

13   are dated after the filing of the lawsuit.  And I

14   understand that, I've done that in the past, and that

15   definitely in some cases makes sense.  But here we're

16   talking about a continuing act of infringement, again, and

17   the web pages as of today, the mark is being used on both

18   USANA's and Dr. Oz's website.  That's relevant, and it's

19   going to be relevant to the jury --

20             THE COURT:   Well, to the extent it goes to

21   confusion, I would tend to agree.  To the extent you're

22   talking about privileged communications, maybe there can

23   be an agreement that you don't have to do a privilege log

24   as to attorney-client communications post the lawsuit, but

25   that's something that is not before me to talk about.
```

```
 1                      PROCEEDINGS                    9
 2           But let me ask you, do you have – is there an
 3   agreement between USANA and ZoCo with respect to the
 4   promotion and marketing of the product?
 5           MR. PETTUS:   There is, yes.
 6           THE COURT:   And do you have that agreement?
 7           MR. PETTUS:   We do have, we have – it's been
 8   renewed, and that's part of how we knew some of the
 9   information that was confidential that we put in our
10   letter.
11           THE COURT:   Okay.
12           MR. PETTUS:   Do we have the internal
13   communications and Oz about that?  No, we do not.
14           THE COURT:   Does the agreement provide for
15   revenue to the ZoCo for sales?
16           MR. PETTUS:   So the agreement pays Dr. Oz quite
17   a sum of money for his promotional activities, but part of
18   that is also strategic suggestions, strategic evaluation
19   of the product.  So whenever there's a new product, they
20   tell him how he's their trusted partner, and he gets that
21   new product into millions of homes.  But what goes on
22   behind the scenes is they vet these products, they come up
23   with strategies, and it is not just USANA.  The email that
24   we attached at exhibit E is one example that's specific to
25   this product where it was Dr. Oz who was proposing
```

| 1 | PROCEEDINGS | 10 |

2   promotional strategies for this product, and that was

3   followed up on in another email.  We only attaché done

4   because it was the most relevant.

5        THE COURT:   All right, this is a little bit

6   different than some other trademark cases that I've seen

7   where there's a reseller basically.  And as I understand

8   ZoCo and Dr. Oz's role, it's as an advertiser essentially,

9   a sponsor, and then separately a marketing advisor

10  essentially is what you've described.  Is that correct?

11       MR. PETTUS:   So I think it's absolutely correct

12  that that is (inaudible).  In terms of whether, you know,

13  obviously he gave away product as part of the sweepstakes,

14  that was through is website, and he's also fielding

15  inquiries, I mean he's the expert on the product.  When

16  someone's watching this, and I have to say I've seen some

17  videos – I don't watch his show – but he's touting a

18  product and it's healthy, it's beneficial to you and

19  you're going to lose weight.  And consumers, he's got

20  millions of followers, they believe him.

21            And when they have a question about it, again,

22  we got the call because there was confusion about our

23  product, he gets the call.  They don't watch it and put

24  together that this is a USANA product.  So our view is

25  that there's some highly relevant information, whatever

```
 1                          PROCEEDINGS              11
 2  you want to call it, customer service, those sort of
 3  inquiries which could potentially be very relevant.
 4          In terms of sales, I mean he's given them away,
 5  and that was, that's an infringement and that's a problem,
 6  he gave away $47,000 worth of product with our trademark
 7  on it, and that's still we feel subject to our damages
 8  claim.  There are products that he does sell.  I don't --
 9          THE COURT:   Infringing products?
10          MR. PETTUS:   No.
11          THE COURT:   Oh, okay.
12          MR. PETTUS:   So there are other products he
13  does actually sell.
14          THE COURT:   Okay, so in terms of money or, the
15  47,000 I assume USANA would be primarily responsible for
16  that amount given away.
17          MR. PETTUS:   We have not sued Dr. Oz.
18          THE COURT:   Right.
19          MR. PETTUS:   He was front and center in our
20  complaint because that's what instituted --
21          THE COURT:   Right, I understand.
22          MR. PETTUS:   -- the entire action.  We made a
23  tactical – we didn't want to do that.
24          THE COURT:   Right.
25          MR. PETTUS:   My client didn't want to do that.
```

```
 1                        PROCEEDINGS              12
 2  We haven't done that.  I know there was some talk about
 3  this trying to be a headline grab.  Not at all.  There's
 4  been no press release.  My client just wants to get the
 5  evidence they need to try to resolve this case one way or
 6  the other and get the compensation, and they're not going
 7  after Dr. Oz or ZoCo.  They just want discovery from them,
 8  that's the subpoenas.  The damages, to the extent we can
 9  prove it, you know, hopefully we can benefit of the
10  information from ZoCo and Dr. Oz.  We'll (indiscernible).
11            THE COURT:   All right, Mr. Burton, are you
12  going to address them?
13            MR. BURTON:   Thank you, Your Honor.  I'm going
14  to bounce around a little bit and address some of the
15  issues that you discussed with Mr. Pettus.
16            THE COURT:   Sure.
17            MR. BURTON:   Your first question was can these
18  topics be narrowed, and they absolutely can be narrowed.
19  As we communicated in our briefing, we have a concern
20  fundamentally with the fine term, USANA Shake Products.
21  If you look at it, it's defined to include any product
22  that includes MySmart, and that is overbroad on its face
23  because there's a covenant not to sue Devpat, that they
24  will not sue USANA for its use of the USANA MySmart mark
25  they're using now.  That's how the Utah case, that's how
```

```
 1                        PROCEEDINGS                    13
 2  they resolved the Utah case.
 3           So the topic, it's interesting, in the defined,
 4  in the definitions of the different subpoenas, the MySmart
 5  product is used singularly, but in the actual deposition
 6  topics and then the different requests for the document
 7  requests, it's used in the plural.  So one of the concerns
 8  we have upfront is there needs to be an understanding from
 9  our perspective that this - to the extent there is
10  discovery, it's limited to the mark issue not the new
11  mark, whether there's a covenant not to sue.
12           THE COURT:   I think from what I've heard and
13  read, I don't think plaintiff would have a problem with
14  that.  Is that correct?
15           MR. PETTUS:   And I think that's generally
16  correct, but like everything there's a twist to this.
17  What we've heard from the defendant is that, they gave us
18  some information before they went off and filed the Utah
19  suit, and it was how much they had in inventory.  I don't
20  want to say in open court, but it was - our client had a
21  sense of how much had that trademark, and that's a
22  fundamental piece for the damages claim, and I'll just say
23  it's big, and that's why it was an issue.  And the concern
24  was we don't want to destroy all that, and they ended up
25  filing their suit, and here we are today before Your
```

```
 1                         PROCEEDINGS                14
 2   Honor.
 3           Now, what they've told us and what they told
 4   Judge Koeltl at a recent hearing is, well, we've changed
 5   our packaging.  We're not using the mark anymore.  However
 6   --
 7           THE COURT:   You have the inventory.
 8           MR. PETTUS:   -- and we've had conversations
 9   with counsel.  You go on their website, and I have it
10   right here, Your Honor.
11           THE COURT:   I saw the exhibits.
12           MR. PETTUS:   Yeah, I mean we went this morning
13   just to make sure.  Did they change it today?  Did they
14   change it last week?  As of today they're still using the
15   trademark.  When you want to click and buy, you know,
16   product X, it has MySmartShake --
17           THE COURT:   So in terms of narrowing to the –
18   but that's still involving the trademark at issue, no?
19           MR. PETTUS:   So if a consumer clicks on that
20   and buys a product, and they ship out a package that is
21   blank, our view is you're still infringing.  You're still
22   using our mark in commerce to get that sale.  And they
23   haven't changed their website; neither has Dr. Oz.  He
24   still has the SmartShake sweepstakes up on his website and
25   links to their website.  And so, again, I don't want to –
```

```
 1                        PROCEEDINGS                  15
 2   obviously --
 3           THE COURT:   But that's use of the trademark
 4   that you're saying is infringing.
 5           MR. PETTUS:   Correct.
 6           THE COURT:   So are you objecting to questions
 7   about use of that trademark --
 8           MR. PETTUS:   No.
 9           THE COURT:   -- on the website or on packaging
10   or bottles?
11           MR. BURTON:   To be clear, what we don't want to
12   be under obligation to do is produce sales information,
13   communications regarding our current use, which we have a
14   covenant not to sue or they won't sue us for that use, and
15   the way the definition --
16           THE COURT:   Current use of a different
17   trademark.
18           MR. BURTON:   Different trademark.  So it's
19   really confusing because --
20           THE COURT:   Current use of the trademark that's
21   at issue in this case is not part of the stipulation.
22           MR. BURTON:   That's not what I'm talking about.
23   I'm talking about the new use of MySmart --
24           THE COURT:   Right.
25           MR. BURTON:   -- and MySmart is an acronym, and
```

```
 1                          PROCEEDINGS              16
 2   I can't remember what it stands for.  What I don't want to
 3   do is put my client in a position where they're obligated
 4   to produce information that is not relevant to that case.
 5   If it's relevant to the new mark, USANA MySmart, that's
 6   not at issue in this case, we have a covenant not to sue,
 7   and we would submit any request or attempt to obtain that
 8   information is contrary to the grounds under which they
 9   proceeded to get the Utah case dismissed with the covenant
10   not to sue.
11          THE COURT:  All right, from what I'm hearing it
12   doesn't sound to me this is a big area of disagreement,
13   but go ahead, Mr. Burton.
14          MR. BURTON:  All right, thank you, Your Honor.
15   The other thing is --
16          MR. PETTUS:  I'm sorry, Your Honor.  If I
17   might, and I can address it after if you'd rather hear --
18          THE COURT:  Yeah, let me hear Mr. Burton, and
19   then you can address.
20          MR. PETTUS:  I apologize.
21          MR. BURTON:  Your Honor, you talked about
22   communications.  This is a – this product was advertised
23   one time on Dr. Oz.  That's not in dispute.  There may
24   have been supplemental efforts, a sweepstake, and maybe
25   put on line through YouTube or other instances.  There's
```

| | PROCEEDINGS | 17 |

1  one instance of this product on Dr. Oz.  I've actually

2  never seen a Dr. Oz show other than in connection with

3  this case, but I understand, like Mr. Pettus, enough to

4  know that he advertises multiple products, not just for

5  USANA but for all sorts of additional people in addition

6  to interviewing folks and doing health things.

7  

8          So it's not unreasonable to think that there

9  would only be a limited number of communications on this

10  one product.  It's on a one-time show, it's not the

11  entirety of the show.  It's a portion of the show.  And we

12  have searched and there's been no allegation that we

13  haven't provided the responsive emails, for example, that

14  we've searched for.  And we have more emails that are

15  coming.  As I indicated to Mr. Pettus last week, we have

16  supplemental production that's coming.

17          Rule 45 is very clear.  If they can obtain this

18  information from us, they first need to see if they get it

19  from us.  It's not enough to just say, well, we don't have

20  a dispute, that it's been provided, but we don't know,

21  therefore, we want to ask for it.  That's not what the law

22  provides for.

23          There was an allegation made that Dr. Oz is our

24  main advertiser, and that's not accurate at all.  Our main

25  advertiser are our hundreds of thousands of distributors

```
 1                          PROCEEDINGS                    18

 2   throughout the country and throughout the world.

 3           THE COURT:    Those are private distributors.

 4           MR. BURTON:    Exactly.  There's people that

 5   invite my wife, for example, over to a house party to do

 6   their thing.  That's our main source of advertising, it's

 7   not Dr. Oz, it's our distributors.  So the fact that our

 8   product is advertised on Dr. Oz in addition to multiple

 9   other products is not sufficient to overcome the fact that

10   that's not our primary way of doing it.

11           This goes back to what I said earlier, and that

12   is we advertise, as the Court has been informed, multiple

13   products on Dr. Oz show.  If the current definitions are

14   kept, the burden on Dr. Oz, on ZoCo, and, frankly, on

15   USANA with respect to discovery requests that are not

16   before Your Honor would be tremendous because we're taking

17   a very, very small portion of a very big pie and being

18   forced to produce the entire pie when it's not an issue,

19   if the subpoenas were enforced as written.

20           With respect to actual foundation, this is

21   puzzling to me, but this source of actual confusion is the

22   basis for this lawsuit.  They've got some lady, as they

23   describe her in their email, they don't know her name,

24   they don't know her number, they don't know her email

25   address, it's a self-serving email from a Devpat employee
```

```
 1                       PROCEEDINGS                19
 2  to a Devpat employee saying somebody called us about this
 3  product.  I think they need to be - and the Court needs to
 4  be careful the weight ascribed to that call because
 5  fundamentally that's not a call that's going to come in as
 6  evidence because they can't demonstrate even who made the
 7  call or that the call was made or what was discussed
 8  during the call.
 9            THE COURT:   Well, in term - so I'm not sure
10  what you say is correct because plaintiff would be able to
11  explain how this issue first came to their attention.
12            MR. BURTON:   I think they would --
13            THE COURT:   That's not a hearsay issue I don't
14  believe.  Maybe that email itself doesn't come in or maybe
15  it does.  That's not before me.
16            MR. BURTON:   Fair enough, and that issue to me,
17  I actually don't think the actual confusion issue has any
18  bearing on what the Court does today because I think it's
19  this, it's a self-serving, uncorroborated,
20  unsubstantiated, it lacks foundation, etc.  And I think it
21  will cause, from an admissibility standpoint, I think it's
22  problematic.  But I don't think it's relevant for purposes
23  of what the Court is doing today.
24            Let me address willfulness.  Mr. Pettus
25  discussed at length that all this information is related
```

to willfulness, but nothing that they're talking about,

Dr. Oz isn't going to be willfully, isn't going to be a

rival for willful infringement because he's not a party.

He gave away product that was given to him; he didn't sell

it.  He has no revenue from this other than what is paid

to him by USANA, and USANA doesn't pay him – they pay him

a lump sum, as I understand it, not product specific, to

advertise their products.

So whether or not Dr. Oz, the sweepstake

winners, Dr. Oz's staff, ZoCo knew about the Utah case,

about the Utah dismissal, about the fact that we're in

this case isn't relevant.  What's relevant is what did

USANA know.  Did USANA know that its infringement was – it

was on notice and, therefore, that there's an issue with

infringement.  And I just think that's a bridge too far to

gap between, a gap to far to bridge, between what Mr.

Pettus is saying about the relevance about Dr. Oz's

knowledge or anybody else's knowledge that's a third party

other than USANA.  I don't think that goes to willfulness.

One of the things that Mr. Pettus raised is

documents created after the lawsuit.  Your Honor hit it

right on the head.  Our agreement, our representations

were limited strictly to attorney-client privilege, not

documents that exist in the regular course of business.

| | PROCEEDINGS 21 |
|---|---|
| 1 | |
| 2 | With respect to the other issues that we have |
| 3 | concerns with is this is, there are 17 topics to a non- |
| 4 | party. That is grossly on its face overbroad, not only |
| 5 | the deposition topics, but also the different document |
| 6 | requests. I think it's also very common in this instance, |
| 7 | and I think it perhaps belies some of counsel's |
| 8 | representations, all this information can be obtained from |
| 9 | a properly prepared 30(b)(6) witness. |
| 10 | We're not standing here before the Court, we |
| 11 | haven't said this in our papers and I'm not saying it |
| 12 | today, that there isn't any information here that's |
| 13 | relevant or that's discoverable. I understand that some |
| 14 | of it may be, but it can be obtained from the entity. It |
| 15 | doesn't need to be obtained from Dr. Oz. And it can be |
| 16 | narrowed so that it's actually relevant to the issues at |
| 17 | hand and not so broad that the parties, that it puts an |
| 18 | undue burden on third parties who aren't a part of the |
| 19 | litigation. |
| 20 | I'd be happy to go through the different topics |
| 21 | and express topic by topic the concerns that we have. I'd |
| 22 | also be happy to brief it if the Court wants us to. I |
| 23 | think on the its face I can identify several topics that |
| 24 | have no relevant. For example, I don't think that the |
| 25 | Utah lawsuit or the dismissal order have any relevance to |

```
 1                            PROCEEDINGS                   22
 2   this case going forward because willfulness is evaluated
 3   through the lens of USANA.  I also don't think that any
 4   agreements or revenue paid is relevant.  That's under
 5   topic 5.  Trademark evaluations, if those occurred, they
 6   would've occurred under an attorney-client privilege, if
 7   they even exist.  I mean I can go through several others,
 8   and obviously we have concerns.
 9            So, for example, if you look at topic 7, each
10   episode of the Dr. Oz show, and then it has some included
11   but not limited to the one episode on which our product
12   was featured.  So we are required then to prepare a
13   witness for each episode of the Dr. Oz show, and I don't
14   think that's what they're intending.  Maybe it is, I don't
15   think it is, but it certainly creates a problem for
16   preparing a witness.
17            And so if the Court wants, I could gladly go
18   through others, but I think the Court understands the
19   issue that this is – there's discovery here to be had, and
20   we don't dispute that, but I think it should be narrowed
21   to the entity and the topic should be narrowly tailored to
22   the issues that are actually involved in this litigation.
23            THE COURT:  Mr. Pettus.
24            MR. PETTUS:  Sure, Your Honor.  Would you like
25   me to address it in any order?  I have my notes.
```

```
 1                          PROCEEDINGS                  23

 2             THE COURT:   Yes, go right ahead, any order is

 3   fine.

 4             MR. PETTUS:   Okay, so just starting from the

 5   last point which is we can narrow this to just the entity

 6   and not Dr. Oz.  There's some real issues with that.  I

 7   mean we included in our letter, which sometimes it's hard

 8   to pick up, we met and conferred on this, and we asked

 9   counsel, and, again, at that time our understanding was he

10   was not representing Dr. Oz, and apparently he is now, but

11   we said is USANA going to call him as a witness at trial.

12   And his response is I can't tell you one way or the other.

13   (indiscernible) a witness, there's just no doubt about it,

14   and, again, I'm not standing on we're entitled to it, but

15   when we do --

16             THE COURT:   If he's going to be called as a

17   witness, and if he was identified as a witness, I tend to

18   agree that you should be permitted to depose somebody

19   who's listed as a person with knowledge and information

20   and a witness.

21             MR. BURTON:   And to be clear, Your Honor, he's

22   not listed by us in our initial disclosures, and I think

23   that the initial disclosures, we've raised issues with the

24   absence of specificity in the initial disclosures.  It's

25   been raised on both sides.  We don't have him listed, and
```

```
 1                         PROCEEDINGS              24
 2   it's not enough to say we don't know at this point,
 3   frankly, if we're going to call him as a witness because I
 4   don't see yet how he's relevant.
 5            THE COURT:   So he hasn't been listed.
 6            MR. BURTON:   Not by us.  He's been listed by
 7   them --
 8            MR. PETTUS:   Well --
 9            THE COURT:   Oh, okay.
10            MR. PETTUS:   No, the question again, I'm sorry,
11   I did not --
12            THE COURT:   I misunderstood what you said.
13            MR. PETTUS:   I was not clear.  It wasn't that
14   he was listed.  And we asked him he's a fact witness, he's
15   relevant in our view.  We listed him, and we asked him,
16   well, you know, their objection was why are you taking Dr.
17   Oz's deposition?  We laid out all the factual reasons and
18   relevancy, and we asked are you saying you're not going to
19   call him, and they wouldn't commit to something like that.
20   I don't even that would do it because, again, we hadn't
21   seen internal documents.  From what we have seen, he has
22   relevant input to every single product.  Again, the one
23   that we gave to the Court he's suggesting strategies for
24   this product.
25            THE COURT:   Strategies in terms of sales and
```

 1 │
 2 │ marketing, is that correct?

 3 │           MR. PETTUS:   Correct, which involves use of the
 4 │ trademark.  And it was after we had contacted USANA about
 5 │ the alleged infringement.  We contacted them in July of
 6 │ 2016.  After that point in time, Dr. Oz is proposing new,
 7 │ different additional promotional strategies for this
 8 │ product.  So, again, relevant that – and it's his slide
 9 │ deck.  That's what the email says.  And that's the one
10 │ email that we have.  Internally, again, when you hear the
11 │ willfulness is only whether or not USANA is willful.  The
12 │ question is not whether or not – is not just what USANA
13 │ has done, but it's also – I'm sorry, the question is
14 │ really what has USANA done for willfulness, right, so is
15 │ USANA aware?  I think counsel said the question is whether
16 │ USANA knows what, you know, that there's an infringement
17 │ issue.

18 │           That's part of it, and that's obviously an
19 │ important part of it because without knowledge you can't
20 │ accuse someone of being intentional and willful.  The real
21 │ willfulness though and just as important is what did you
22 │ do after you learned of that, and, again, I've heard that
23 │ it's not Dr. Oz who's their primary advertiser; it's their
24 │ distributors.  They don't pay those distributors to
25 │ advertise.  They give them compensation for selling.  They

```
 1                         PROCEEDINGS                26
 2    don't pay a cent for advertisement.  They pay Dr. Oz a lot
 3    of money to advertise.  And if you've read our paper, how
 4    they tout is true.  It's how they get in, it's an
 5    exclusive club, they pay to be exclusive, it's really
 6    important, and he's not just some star that sits on the
 7    sidelines.  He's involved.
 8              And, again, I mean that's the relevancy.  I'm
 9    not sure, I'm just trying to look real quick.
10              THE COURT:  Well, for example, in topic 7, each
11    episode of the Oz show, you don't need every single
12    episode of the Oz show?
13              MR. PETTUS:  No, of course not.  No, no.  And,
14    again --
15              THE COURT:  But that's how your topic is
16    written.
17              MR. PETTUS:  If you go on though, and let me
18    pull that out --
19              THE COURT:  I have "each episode, original
20    production and re-run thereof of the Dr. Oz show,
21    including but not limited to the Dr. Oz SmartShake
22    episode, on which a USANA shake product was featured,
23    advertised, promoted, or otherwise mentioned."  So the way
24    that this is written, it's not limited to programs
25    involving the SmartShake.
```

```
 1                        PROCEEDINGS                   27
```

 2          MR. PETTUS:   Your Honor, I just respectfully

 3  read it a different way, and, again, it does say including

 4  but not limited to the Dr. Oz SmartShake episode which is

 5  the one that we're, you know, again, was the one that

 6  caused the actual confusion.  But then when it goes on,

 7  the including but not limited to is that one episode, but

 8  it is limited to each episode on which a USANA shake

 9  product is featured.  So, again --

10          THE COURT:   But you're not interested in all

11  USANA shake products.  You're only interested in USANA

12  shake products that they're the infringing mark.

13          MR. PETTUS:   That USANA shake product is

14  defined specifically as those products that use the

15  MySmart mark.

16          THE COURT:   Okay, because I thought that the

17  third parties were objecting to that definition as being

18  broader than just that.  Did I mishear you or --

19          MR. BURTON:   No, Your Honor, in fact, let me

20  read the definition.  "USANA shake product," this is from

21  65-1, page 6, paragraph 7, "USANA shake product shall mean

22  each shake related product sold by USANA under the name

23  MySmart."  (indiscernible) both the accused product or the

24  accused use and the product covered by the covenant not to

25  sue.

```
 1                         PROCEEDINGS                      28
 2            THE COURT:   And what I'm looking, when I'm
 3   looking through the document requests on subpoena, there
 4   are a number of these requests where you're asking for all
 5   documents and things concerning, going on.  And it seems
 6   to me that some of those may be able to be tailored.  I do
 7   see that you have the last one documents sufficient to
 8   identify, but you don't have that kind of language in the
 9   other requests.  So they are broad.  I understand they're
10   targeted, but they are broad.
11            So I'm just wondering, you said that there was a
12   meet and confer, but you weren't able to resolve the
13   issues.  I guess I have some of the correspondence from
14   before, but it seems like you might be able to meet and
15   confer on a little bit more, at least narrow the issues
16   for briefing.  Because with regard to the definition of
17   the infringing mark and with regard to what episodes, for
18   example, those are just two examples where it seems like
19   there may be, you may be able to avoid some briefing on
20   some of those things.
21            So what I think based on this conference is that
22   you should perhaps have an opportunity over the next week
23   to meet and confer to see if there's any way you can just
24   narrow this a little bit more, and to the extent there are
25   specific issues – I understand the issue of Dr. Oz is
```

```
 1                        PROCEEDINGS                    29
 2  probably not going to be agreed to.  You believe he's
 3  relevant, you believe he's not relevant, and there's going
 4  to need to be briefing on that.  But it may be that you
 5  can narrow the specific topics that are listed as the
 6  deposition topics and the production requests that are
 7  really at issue for me to resolve.  So I think you should
 8  have the benefit of about a week to do that, and then we
 9  set a briefing schedule.
10          Have you all talked about a resolution of this
11  matter?
12          MR. BURTON:   I don't think a resolution of this
13  matter is something that USANA is interested in discussing
14  at this point.
15          THE COURT:   Okay.
16          MR. BURTON:   It's been floated, but my marching
17  orders were to come here today and so --
18          THE COURT:   Okay, this case has only been
19  referred to me for settlement of this particular issue,
20  but to the extent that you do want me to assist with
21  settlement, you can certainly request that.
22          MR. BURTON:   Thank you, Your Honor.
23          MR. PETTUS:   Yes, Your Honor, and, Your Honor,
24  if I might, and, again, I don't know if it helps matters,
25  but it's been more than floated before the Utah suit got
```

```
 1                          PROCEEDINGS                    30
 2   filed, and if you read the court's decision on that, and
 3   the reason why, there were two reasons why it got kicked
 4   out.  There was procedural fencing.
 5             THE COURT:   Right, I saw that.
 6             MR. PETTUS:   We had --
 7             THE COURT:   I mean I saw the decision that you
 8   attached.
 9             MR. PETTUS:   Where essentially we had reached
10   an agreement we felt we had on a settlement, and our
11   client would've been fine.  There was one issue left, and
12   they said we'll get back to you, and instead they sued us.
13   Since then we've tried, but counsel, he's got his marching
14   orders.  There's been no progress since then.
15             MR. BURTON:   I wasn't involved at all in any of
16   the pre-filing discussions.  So my scope is limited to my
17   actions.
18             THE COURT:   Okay, so let's just set a schedule,
19   and I'll try to resolve this as expeditiously as possible.
20   So I'm going to give you a week, that is, until November 6
21   to meet and confer and to hone in on those specific
22   numbered requests that you're fighting about or the bigger
23   issue of just whether Dr. Oz should be deposed or
24   individually be required to answer any of the document
25   requests as opposed to ZoCo.
```

```
 1                        PROCEEDINGS                    31

 2            And, by the way, I don't know if there was, if

 3   ZoCo's identifying somebody to testify, for example, who

 4   it would identify, if it would identify Dr. Oz, then maybe

 5   it's a, maybe it's not worth fighting about Dr. Oz.  But

 6   I'll leave that up to you to talk about over the next

 7   week.  So talk about it over the next week.  And then the

 8   motion for a protective order I think that should be filed

 9   the following week, so by the 13ᵗʰ.  Is that enough time?

10            MR. BURTON:   That's fine, Your Honor.

11            THE COURT:   And then that will give you a week

12   to respond?

13            MR. BURTON:   Yes, Your Honor.

14            THE COURT:   So that will be before Thanksgiving

15   so your Thanksgiving is not ruined.

16            MR. BURTON:   Thank you.

17            THE COURT:   And then I'll take a look at it.

18   Now, if, again, if in your meet and confers you want to

19   talk about a potential resolution instead of your client

20   spending a lot of money on litigation and briefing, say

21   that you've met me and that, you know, you can request a

22   mediation before me, and I'd be very happy to try to help

23   you to do that before you spend more money and are off to

24   the races.  Many trademark cases, as you probably both

25   know, are resolved through settlement.  So I offer that to
```

```
 1                        PROCEEDINGS                    32

 2   you as something to think about.  Okay.

 3            MR. BURTON:   Thank you, Your Honor, much

 4   appreciated.

 5            THE COURT:   All right, so I'll issue an order

 6   setting this schedule and nice to meet you --

 7            MR. BURTON:   Just a point of clarification.

 8            THE COURT:   Sure.

 9            MR. BURTON:   Under your schedule, are we

10   entitled to a reply or you want just a motion and an

11   opposition?

12            THE COURT:   I don't think a reply is going to

13   be needed.

14            MR. BURTON:   If there are issues, would it be

15   all right with Your Honor if we see what they file,  and

16   to the extent we want a reply, we can send you a letter --

17            THE COURT:   Yes.

18            MR. BURTON:   -- and explain the narrow scope of

19   a reply --

20            THE COURT:   Yes.

21            MR. BURTON:   I understand that the Court

22   doesn't necessarily want one, we'll articulate why we feel

23   we need one.

24            THE COURT:   Yes, that's fine.

25            MR. BURTON:   Okay.
```

```
 1                           PROCEEDINGS                  33

 2              MR. PETTUS:   Actually, it raises a good point,

 3   and I'm sure it's in Your Honor's rules, but in terms of

 4   length, is there any minimization of that that you'd like.

 5              THE COURT:   So, well, I like it as short as

 6   possible.

 7              MR. PETTUS:   I think we all do.

 8              THE COURT:   Twenty pages, is that sufficient?

 9   More than sufficient, right?

10              (interposing)

11              MR. BURTON:   The reason which I think 20 is

12   okay is because there are 17 topics.

13              THE COURT:   Right.

14              MR. BURTON:   And so I don't --

15              THE COURT:   You don't have to - you can just

16   append the requests --

17              MR. BURTON:   Understood.

18              THE COURT:   -- and you don't have to list them

19   all in your actual briefing.  So if it can be shorter than

20   20 pages, I'd appreciate it, but I want to give you

21   sufficient space.

22              MR. BURTON:   Thank you, Your Honor.

23              THE COURT:   Okay?

24              MR. PETTUS:   Thank you, Your Honor.

25              MR. BURTON:   Very much appreciate it.
```

```
 1                          PROCEEDINGS                    34

 2          THE COURT:   All right, anything else?

 3          MR. BURTON:   No, Your Honor.

 4          MR. PETTUS:   No, Your Honor.

 5          THE COURT:   All right, nice to meet you all.

 6          MR. PETTUS:   Nice to meet you too, thank you.

 7  Have a nice day.

 8          THE COURT:   You too.

 9          (Whereupon, the matter is adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

35

C E R T I F I C A T E

        I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the case of Devpat v. USANA

Health Sciences, Docket #18cv2858, was prepared using

digital transcription software and is a true and accurate

record of the proceedings.




Signature_____

                    Carole Ludwig

Date:      November 3, 2018